UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION

| | | |
|---|---|---|
| WILLIAM CHRISTOPHER MATHIS, as Administrator of the Estate of Michael Jerrime Mathis, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 6:23-cv-1709-GMB |
| JONATHAN STEWART, d/b/a Stewart Roofing, | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Michael Mathis filed a complaint against Jonathan Stewart d/b/a Stewart Roofing alleging overtime violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207. Doc. 1. Following the plaintiff's death, the court substituted William Christopher Mathis, as Administrator of the Estate of Michael Jerrime Mathis, as the plaintiff in this action. Doc. 35. The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Doc. 11. Before the court is William Mathis' Motion for Summary Judgment. Docs. 42–44. Stewart, who is representing himself in this action, filed a one-page response to the motion (Doc. 47), and Mathis filed a reply. Doc. 48. The motion is due to be denied.

### I. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The purpose of summary judgment is to separate real, genuine issues from those which are formal or pretended." *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

When a district court considers a motion for summary judgment, it "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the nonmovant." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008) (internal quotation marks and citation omitted). The court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." *Allen v. Bd. of Pub. Ed. for Bibb County*, 495 F.3d 1306, 1315 (11th Cir. 2007) (citation omitted).

The moving party "always bears the initial responsibility of informing the

district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  In addition to this initial burden, the movant must show that no reasonable jury could find for the nonmovant "on all the essential elements of its case on which [the movant] bears the burden of proof at trial." *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1438 (11th Cir. 1991).

"If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the non-moving party, in response, 'comes forward with significant, probative evidence demonstrating the existence of a triable issue of fact.'" *Id*. (quoting *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991)) (cleaned up).  "Of course," however, "if the movant fails to satisfy its burden, the non-movant need not make this showing and the [c]ourt will deny the motion for summary judgment." *Pilkington v. United Airlines*, 921 F. Supp. 740, 744 (M.D. Fla. 1996), *aff'd*, 112 F.3d 1532 (11th Cir. 1997) (citing *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991)).

## II. FACTUAL BACKGROUND[1]

Stewart is the sole proprietor of Stewart Roofing, a company that provides roofing installation and repair services for residential and commercial buildings. Doc. 43-1 at 5, 7.  Stewart is responsible for "sell[ing] the jobs" (Doc. 43-1 at 8), and he usually purchases the shingles or metal roofing materials and arranges for them to be delivered to job sites. Doc. 43-1 at 12, 21–22; Doc. 43-4 at 4.  Stewart Roofing has separate crews of one to four roofers for flat-roofing, metal roofs, and shingle roofs. Doc. 43-1 at 8 & 12.  Stewart describes all of the people who work with him as "subcontractors."[2] Doc. 43-1 at 12.  Each crew is responsible for handling the materials and completing its work at a job site. Doc. 43-1 at 8, 12–13, 21.  Once a job is complete, Stewart charges the customer for the labor and materials. Doc. 43-1 at 8.

### A.    The Working Relationship

Michael Mathis worked for Stewart as a roofer from 2004 until October 17, 2022. Doc. 43-1 at 9–10.  His job duties included stripping existing roof shingles,

---

[1] The motion for summary judgment relies on Stewart's deposition testimony (Doc. 43-1); Stewart's answers to interrogatories (Doc. 43-2); Stewart Roofing's gross receipts for 2020, 2021, and 2022 (Doc. 43-3); and his own declaration. Doc. 43-4.  Stewart did not present any evidence to dispute any of the facts in the record. *See* Doc. 47.  Mathis contends that his declaration "corroborates" all of Stewart's deposition testimony (Doc. 44 at 13), but the court will note certain sections where the two seem to be at odds with each other.

[2] Stewart testifies that all of his roofers sign a "subcontractor agreement." Doc. 43-1 at 20.  He argues in his response brief that Michael Mathis signed one of these agreements, but he does not offer any evidence to support this claim. Doc. 47.

replacing boards, cleaning debris, and installing new shingles. Doc. 43-4 at 4.  This position did not require any special training, previous attendance at a trade school, or higher education, but it is a "learning process," and Mathis participated in at least two independent training programs while working for Stewart, eventually becoming a certified "master roofer." *See* Doc. 43-1 at 14, 22–23.

Mathis' working relationship with Stewart "started and stopped so many times." Doc. 43-1 at 9.  According to Stewart, Mathis "worked when he wanted to." Doc. 43-1 at 10.  "He was given jobs to do, and that would be sometimes jobs he picked, which job he wanted to do, or it would be what jobs are available."[3] Doc. 43-1 at 10.  He did not continuously work for Stewart, and he told Stewart that he was working for other people at the same time. Doc. 43-1 at 10.

Stewart did not require Mathis or his other roofers to be on a job site at any specific time, instead deferring to them to "talk[] about what time [they] wanted to meet" each morning. Doc. 43-1 at 10.  Usually this meant that they began working around 7:00 a.m., but the schedule depended on the season. Doc. 43-1 at 11.  To avoid the heat in the summer, they may have started work at 5:00 or 6:00 in the morning. Doc. 43-1 at 11.  And due to frost in the winter, they may have waited until 8:00 a.m. to begin work. Doc. 43-1 at 11.  While at the job sites, each individual

---

[3] William Mathis states in his declaration that "Stewart designated the specific jobs Michael . . . worked." Doc. 43-4 at 3.

5

roofer decided when he wanted to take a break, eat lunch, and leave for the day. Doc. 43-1 at 11. These decisions were "based on the weather, how hot it is [or] if it's raining." Doc. 43-1 at 11. In the summer, Stewart testified that they typically finished the workday by 1:00 or 2:00 p.m.[4] Doc. 43-1 at 11. Stewart did not keep any record of the roofers' hours (Doc. 43-1 at 11, 23–24); he directed them to "keep up with what they're doing on jobs" so they can be sure "they're paid what they're owed." Doc. 43-1 at 19.

During roofing jobs, Stewart provided "anything that goes on the roof," like the shingles and nails. Doc. 43-1 at 13–14, 22; Doc. 43-4 at 4. Mathis never paid for or provided these materials. Doc. 43-1 at 14. Stewart also owned a dump trailer, which the roofers used to discard debris. Doc. 43-1 at 13; Doc. 43-4 at 4. But Mathis brought his own hand tools and "any equipment he would need to tear off a roof." Doc. 43-1 at 14. This included "aprons, hammers, knives, drills[,] ladders, forks, [and] tile tools." Doc. 43-1 at 14. If any job required specialty ladders or safety equipment that the roofers did not own, Stewart could provide it. Doc. 43-1 at 14; *see* Doc. 43-4 at 4.

On the job site, Mathis was "in charge of [himself]." Doc. 43-1 at 12–13. Multiple roofers might work together to complete a project, but Stewart never

---

[4] As discussed below, William Mathis does not agree that they worked such short days in the summer.

assigned a foreman. Doc. 43-1 at 12–13. If there was a conflict between the roofers, Stewart would visit the job site and he had the final say in the dispute. Doc. 43-1 at 13. Otherwise, he would occasionally visit job sites to "check on" the roofers and "see how work [is] going." Doc. 43-1 at 11.

Mathis' pay differed from job to job, so he and Stewart talked about pay for "each and every job before, during, or after" its completion. Doc. 43-1 at 14. At times, Stewart paid Mathis based on "how many square feet [he] put on" or how much he "tore off." Doc. 43-1 at 14. At other times, his pay "could have been by the day, like a minimum charge." Doc. 43-1 at 14. When Stewart used a minimum daily rate, this varied from $125 to $175 depending on the location of the job and Mathis' duties. Doc. 43-1 at 15. Stewart sometimes paid extra if Mathis finished a job early (Doc. 43-1 at 24), or he could reduce Mathis' pay "if he did not think enough work was accomplished on the project." Doc. 43-4 at 4.

After the completion of a job, Mathis and Stewart would compare "notes"[5] because Mathis "didn't want [Stewart] forgetting about any" of his jobs or hours completed, and Stewart "didn't want [Mathis] adding too many." Doc. 43-1 at 19. Stewart would then write a check addressed to Mathis, cash the check himself, and give the cash to Mathis. Doc. 43-1 at 19–20. According to Stewart, this method

---

[5] If these "notes" were recorded in any way, the parties have not produced a copy.

allowed him to "keep documentation of what he was paying." Doc. 43-1 at 20. But the file folder where he kept this documentation—as well as any other records related to Mathis—are missing from his office. *See* Doc. 43-1 at 17, 19–20.

## B.    Hours Worked

To establish the hours Michael Mathis worked for Stewart Roofing, William Mathis submitted a declaration.[6] Doc. 43-4. According to that declaration, William Mathis worked for Stewart Roofing from the summer of 2021 to October 2022. Doc. 43-4 at 3. During this time, he "regularly worked with [his brother] on the job sites" and they "worked together most every day such that [his brother's] hours worked were the same as [his] hours worked." Doc. 43-4 at 3, 4.

William Mathis described his work schedule:

- "I often worked ten (10) to twelve (12) hours per day during the summer months and fewer hours during the winter months, but almost more than forty hours or more per week unless weather conditions prevented our ability to work." Doc. 43-4 at 3.

- "While working for Mr. Stewart, I often worked five (5) to six (6) [days][7] per

---

[6] Stewart contends that "[William Mathis] is not a credible witness for this case, due to he has no direct knowledge and also he is biased in the case trying to cost myself more money because I had to evict him and his family out of one of my rental properties that I owned at the time." Doc. 47. At summary judgment, however, the court cannot make credibility determinations. *Anderson*, 477 U.S. at 255 (1986). William Mathis' declaration is based on personal knowledge and demonstrates that he is competent to testify on the matters stated pursuant to Federal Rule of Civil Procedure 56(c)(4), which is all the law requires at this stage of the proceedings. *See* Doc. 43-4.

[7] The declaration states that he worked "five (5) to six (6) *hours* per week." Doc. 43-4 at 3 (emphasis added). Mathis' counsel contends in his motion that it is clear from the context that this

week." Doc. 43-4 at 3.

- "Michael, myself, and other workers met at Mr. Stewart's house between 6:30–7:00 a.m. every day." Doc. 43-4 at 4.

- "The workday concluded once the sun went down and darkness prevented a safe working environment."[8] Doc. 43-4 at 4.

## III. DISCUSSION

William Mathis contends that the evidence before the court establishes that his brother, Michael, worked between 60 and 72 hours per week without overtime pay such that he is entitled to judgment as a matter of law on his FLSA claim. Doc. 44 at 16–17.   At summary judgment, Mathis bears the initial burden of establishing the essential elements of an FLSA overtime compensation claim. *See* 29 U.S.C. § 207; *Four Parcels*, 941 F.2d at 1438.   These elements include: (1) that an employer-employee relationship existed, (2) that the employer was engaged in interstate commerce, and (3) that the employee worked more than 40 hours per week without overtime wages. 29 U.S.C. § 207; *see Shumann v. Collier*

---

statement should have been a reference to days, not hours. Doc. 44 at 6.   Counsel could have filed a motion for leave to file an amended declaration to remedy this alleged typographical error. *See Thomas v. Atlanta Publ. Sch.*, 2022 WL 19406071, at *4 (N.D. Ga. Aug. 30, 2022), *aff'd*, 2024 WL 2992938 (11th Cir. June 14, 2024).   The court, however, will accept this correction because a fair reading of the declaration supports this interpretation and Stewart did not object to Mathis' correction in his response. *See id.* at *4–5.

[8] To fix his brother's work schedule more precisely, Mathis asks the court to take judicial notice of the sunset times for the years 2021 and 2022 recorded by the United States Naval Observatory. Doc. 44 at 5.   As discussed below, however, a record of the sunset times would not resolve Mathis' summary judgment deficiencies.

*Anesthesia, P.A.*, 803 F.3d 1199, 1207–08 (11th Cir. 2015); *Thorne v. All Restoration Servs., Inc.*, 448 F.3d 1264, 1265–66 (11th Cir. 2006); *Allen*, 495 F.3d at 1315.  The issues in dispute here are whether (1) Michael Mathis was an employee of Stewart Roofing, and (2) he worked overtime hours without overtime pay.

## A.    Employment Status

Under the FLSA, "'no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours." *Reich v. Dept. of Conserv. & Nat. Res.*, 28 F.3d 1076, 1081–82 (11th Cir. 1994) (quoting 29 U.S.C. § 207(a)(1)).  The statute defines an "employee" as "any individual employed by an employer," 29 U.S.C. § 203(d), and "employ" as "to suffer or permit to work." 29 U.S.C. § 203(g).  While these definitions are "intended to be 'comprehensive enough' to include 'working relationships, which prior to this Act, were not deemed to fall within an employer-employee category,'" they do not "bring 'independent contractors' within the FLSA's ambit." *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1311 (11th Cir. 2013) (quoting *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 728–29 (1947)).

To decide whether an individual is an employee or independent contractor, "courts look to the 'economic reality' of the relationship between the alleged employee and alleged employer and whether that relationship demonstrates dependence." *Id.* at 1311–12 (explaining that courts should focus on "whether an

10

individual is 'in business for himself' or is 'dependent upon finding employment in the business of others'").  Courts should assign little weight to "the 'label' put on the relationship by the parties or the contract controlling that relationship, but rather focus[] on whether 'the work done, in its essence, follows the usual path of an employee.'"[9] *Id.* at 1311 (quoting *Rutherford Food*, 331 U.S. at 729).  Six factors typically guide the economic reality test: "(1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed; (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; (3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers; (4) whether the service rendered requires a special skill; (5) the degree of permanency and duration of the working relationship; (6) the extent to which the service rendered is an integral part of the alleged employer's business." *Id.* at 1312.  No one factor is determinative, and the core inquiry is economic dependence. *Id.*

### 1.    *Degree of Control*

"The first factor considers the nature and degree of the alleged employer's control as to the manner in which the work is to be performed." *Id.* at 1313.  This

---

[9] Stewart argues that Mathis was not an employee because he signed a "subcontractor agreement every year." Doc. 47 at 1; *see* Doc. 43-1 at 20 (testifying that all subcontractors signed these agreements, but he could not produce the form agreement).  Particularly when the record does not include a copy of Mathis' agreement, this argument carries little weight.

includes[10] consideration of whether the alleged employer "supervised and controlled employee work schedules or conditions of employment." *Villarreal v. Woodham*, 113 F.3d 202, 205 (11th Cir. 1997) (internal quotation marks and citation omitted). While control does not require constant supervision, a worker who enjoys flexibility in setting his schedule and regulating his work is more likely to be an independent contractor. *See Heningburg v. CSS Corp.*, 2015 WL 13081182, at *7–8 (N.D. Ga. Aug. 14, 2015) (finding that nurses who "enjoyed substantial flexibility in fashioning their own schedules," could decline jobs, could work for competing agencies, and were subject to little supervision were more likely to be independent contractors even though the putative employer gave them a detailed list of tasks to be completed at each job).  On the other hand, a worker is more likely to be an employee when his employer goes beyond setting macro-level goals to dictate the manner and means for accomplishing his daily tasks. *Compare Scantland*, 721 F.3d at 1313 (explaining plaintiffs were likely employees because the employer "controlled what jobs plaintiffs did, how much they were paid, how many hours they worked, how many days they worked, their daily work schedule, whether they could work for others, whether they could earn additional income from customers, and

---

[10] Other considerations include whether the employer has the power to hire or fire the employee, determines the rate and method of payment, or maintains employment records. *Villarreal*, 113 F.3d at 205.  The limited evidence in the record here does not allow for meaningfully consideration of these factors, and the parties do not focus on them in their briefs. *See* Doc. 44 at 19; Doc. 47.

closely monitored the quality of their work"), *with Freund v. Hi-Tech Satellite, Inc.*, 185 F. App'x 782, 783 (11th Cir. 2006) (affirming the district court's determination that a satellite installer was an independent contractor for a satellite company where the company's interest in the installer's work "was the end result of customer satisfaction, and not with the day-to-day regulation of his work habits, hours worked or work methods").

Viewing the evidence in the light most favorable to Stewart, this factor favors independent contractor status. Mathis enjoyed substantial flexibility in setting his schedule since he picked from available jobs and "worked when he wanted to." Doc. 43-1 at 10. Even if "Stewart designated the specific jobs" for Mathis to work, as his brother claims, there is no evidence that Mathis could not freely decline these jobs. *See* Doc. 43-4 at 3; *cf. Scantland*, 721 F.3d at 1313 (explaining that technicians were more likely employees where their employer told them they could decline work assignments but threatened to fire the technicians who actually exercised that right). And Stewart was under the impression that Mathis was performing roofing services elsewhere when he was not working with Stewart Roofing.[11] *See* Doc. 43-1 at 10.

As for his day-to-day duties and responsibilities, Mathis was "in charge" of

---

[11] Mathis' ability to accept other jobs suggests independent contractor status even if there is no specific evidence in the record that he actually took advantage of this freedom. *See Heningburg*, 2015 WL 13081182, at *7 (citing *Freund*, 185 F. App'x at 784).

himself. Doc. 43-1 at 12–13.  He and the other roofers decided when to arrive, when to take breaks, and when to head home each day.[12] Doc. 43-1 at 10–11.  While Stewart visited job sites occasionally to check on progress (Doc. 43-1 at 11–13), there is no evidence in the record that Stewart exercised meaningful supervision over Mathis during these visits or directed the manner in which he completed his tasks so long as he eventually completed the job.

### 2.    *Opportunity for Profit or Loss*

"The second factor considers the alleged employee's opportunity for profit or loss depending upon his managerial skill." *Scantland*, 721 F.3d at 1316.  Proof of a profit opportunity "has more to do with relative investments, with control over larger aspects of the business, and with like forms of initiative" than with the alleged employee's effort or proficiency. *Harrell v. Diamond A Ent.*, 992 F. Supp. 1343, 1351 (M.D. Fla. 1997).  Here, Mathis did not have much, if any, potential for profit or loss since Stewart received the bids on all jobs, purchased the necessary materials, absorbed the cost of pre-purchased supplies if a client backed out of a job, and generally did not permit his roofers to upsell or offer additional services to clients. Doc. 43-1 at 14 & 22.  The record does reflect that Mathis sometimes received extra pay if he finished his work early (Doc. 43-1 at 24), but the "ability to earn more by

---

[12] Although there is evidence Mathis started his day around 6:30 or 7:00 a.m. and worked until sunset, Stewart did not mandate this schedule. *See* Doc. 43-4 at 3.

being more technically proficient is unrelated to an individual's ability to earn or lose profit via his managerial skill, and it does not indicate that he operates his own business." *Scantland*, 721 F.3d at 1317.  This factor thus favors employee status.

### 3.    Investment in Equipment or Material

"The third factor considers the alleged employee's investment in equipment or materials required for his task, or his employment of workers." *Scantland*, 721 F.3d at 1317; *Layton v. DHL Express (USA), Inc.*, 686 F.3d 1172, 1181 (11th Cir. 2012) ("[W]orkers are more likely to be economically dependent on the person who supplies the equipment.").  Any investments in training or continuing education also may be indicative of independent contractor status. *Olden v. Quality Care & Advoc. Grp, Inc.*, 2021 WL 4176243, at *4 (S.D. Ga. Sept. 14, 2021); *Heningburg*, 2015 WL 13081182, at *9 (finding that nurses who invested in everyday supplies such as scrubs, thermometers, and tape measures and were responsible for their own ongoing education were more likely independent contractors); *Partridge v. Mosley Motel of St. Petersburg Inc.*, 2016 WL 70705, at *6 (M.D. Fla. Jan. 6, 2016) (finding motel maintenance worker who utilized the motel's equipment and supplies—with the exception of his own personal drill—was more likely an employee).

Here, Stewart provided the roofing materials and dump trailer, but Mathis used his own "aprons, hammers, knives, drills, ladders, forks, [and] tile tools." Doc. 43-1 at 13–14; Doc. 43-4 at 4.  While Stewart could provide additional specialty

equipment, there is no evidence Mathis ever used any of that equipment. In addition, Mathis participated in independent training courses and eventually earned certification as a "master roofer."[13] Doc. 43-1 at 14, 23. This factor leans toward independent contractor status since Mathis invested in his own equipment and participated in continuing education courses.

### 4.    *Special Skill*

"The fourth factor considers whether the service rendered requires a special skill." *Scantland*, 721 F.3d at 1318. A worker who performs specialized work is more likely to be an independent contractor, but the simple fact that a worker is "skilled is not itself indicative of independent contractor status." *Kinslow v. 5 Star Field Servs. Grp.*, 2021 WL 3493564, at *14 (N.D. Ga. Aug. 9, 2021) (internal quotation marks and citation omitted). "What matters is whether the worker is exercising business skills or initiative in addition to his or her technical skills." *Id.* (internal quotation marks and citation omitted). For that reason, a worker who performs routine work is less likely to be considered an independent contractor. *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1314 (5th Cir. 1976).

Mathis' duties required him to strip roof shingles, replace boards, clean debris, and install new shingles. Doc. 43-4 at 4. While he may have been certified as a

---

[13] While Stewart sometimes attended training programs with his roofers (Doc. 43-1 at 23), there is no evidence he paid for the programs or encouraged participation.

master roofer, his job at Stewart Roofing did not require special training or higher education. Doc. 43-1 at 14, 22–23.  These tasks are routine in nature and there is no evidence he exercised any meaningful business initiative beyond performing these tasks. *See Kinslow*, 2021 WL 3493564, at *14 (finding that handyman work, which required some skill but not specialized training or the exercise of initiative, was more likely the work of an employee).  This factor thus favors employee status.

### 5.    *Degree of Permanency and Duration*

Permanence or a longer duration of the working relationship suggests the subordinate is an employee. *Scantland*, 721 F.3d at 1318.  When applying this factor, courts consider (1) "the consistency of the work," (2) "whether the job was the primary source of employment," and (3) "the duration of the relationship." *Kellogg v. Fannie's Inc.*, 467 F. Supp. 3d 1296, 1313 (N.D. Ga. 2020) (internal quotation marks and citation omitted).  A relationship that lasts for more than one year may signify permanence. *See id.*

Mathis worked for Stewart Roofing for nearly 20 years, but he did so intermittently. Doc. 43-1 at 9–10.  In addition, when Mathis "wasn't needing a job" from Stewart Roofing, he told Stewart he took on roofing jobs for other people. Doc. 43-1 at 10.  The record does not reflect the length or frequency of the gaps in Mathis' work with Stewart Roofing, but even the existence of these gaps weighs against permanence.  This factor thus leans toward independent contractor status

when viewing the evidence in the light most favorable to Stewart.[14]

### 6. *Integral Part of the Business*

The court can make quick work of the final factor, which "considers the extent to which the service rendered is an integral part of the alleged employer's business." *Scantland*, 721 F.3d at 1319. Mathis was a roofer who installed and repaired roofs for a roofing company. He performed work integral to Stewart Roofing, suggesting the existence of an employment relationship.

### 7. *Consideration of All Factors*

While some of the factors favor employee status, there is at least some evidence supporting independent contractor status as to all but the last factor. And where Stewart's testimony and William Mathis' declaration contradict, the court is not permitted to weigh that evidence or to make credibility determinations; it must view the facts in the light most favorable to Stewart. Having done so, court concludes that a reasonable factfinder evaluating the evidence could find that Michael Mathis was an independent contractor performing work for Stewart Roofing. The court therefore finds that William Mathis has not demonstrated as a matter of law that his brother was Stewart's employee as defined by the FLSA.

---

[14] The court is mindful that it should afford the permanence factor "only modest weight in assessing employee status under the FLSA." *Kellogg*, 467 F. Supp. 3d at 1313 (internal quotation marks and citation omitted).

Although this finding alone prevents summary judgment, the court alternatively considers whether Mathis has shown that his brother worked overtime without pay.

## B.    Overtime

The FLSA generally requires overtime compensation for employees who work more than 40 hours in a regular work week. 29 U.S.C. § 207(a).  To prevail on an FLSA claim, a plaintiff must show that he (1) worked overtime without compensation, and (2) the employer knew or should have known of the overtime work. *Allen*, 495 F.3d at 1314–15.

While the plaintiff bears the burden of demonstrating that he performed work for which he was not properly compensated, "the remedial nature of [the FLSA] and the great public policy which it embodies . . . militate against making that burden an impossible hurdle for the employee." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87 (1946), *superseded on other grounds by* Portal to Portal Act of 1947, 29 U.S.C. §§ 251–62.  It is the "employer's duty to keep records of the employee's wages, hours, and other conditions and practices of employment." *Allen*, 495 F.3d 1306, 1315 (11th Cir. 2007) (citing *Mt. Clemens*, 328 U.S. at 687).  After all, the employer is "in a superior position to know and produce the most probative facts concerning the nature and amount of work performed and 'employees seldom keep such records themselves.'" *Id.* (quoting *Mt. Clemens*, 328 U.S. at 687) (cleaned up).

Assuming that Mathis was an employee such that the law required Stewart to

19

keep records of his hours, the parties do not dispute that Stewart did not keep those records. *See* Doc. 44 at 15; Doc. 47; *see also* Doc. 43-1 at 11, 23–24.  For this reason, Mathis' evidentiary burden is relaxed.[15] *Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1315 (11th Cir. 2013).  An employee meets this lower burden "if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Allen*, 495 F.3d at 1316; *Jackson*, 606 F. App'x at 952.  The burden then shifts to the employer, who must "bring forth either evidence of the precise amount of work performed or evidence to negate the reasonableness of the inference to be drawn from the employee's evidence." *Allen*, 495 F.3d at 1316.

An employee cannot prove that he worked overtime hours by relying on conclusory allegations. *See, e.g.*, *Jackson*, 606 F. App'x at 952; *Gilson v. Indaglo, Inc.*, 581 F. App'x 832, 833–34 (11th Cir. 2014) (holding that plaintiffs did not establish the amount of uncompensated work where "Hinz testified he worked 52–54 hours per week and Gilson testified he worked 50–60 hours per week, but neither

---

[15] Mathis argues that he is entitled to summary judgment because Stewart did not keep accurate records of his brother's hours. Doc. 44 at 15 (citing 29 U.S.C. § 211).  The lack of records results in a "relaxed evidentiary standard," but it does not establish liability under the overtime provisions of the FLSA. *Garcia v. Warehouse 305 LLC*, 2024 WL 1929492, at *8 (S.D. Fla. May 2, 2024) (citing *Jackson*, 606 F. App'x at 952).

could recall the hours worked in any particular week"). The Eleventh Circuit illustrated this proposition in *Jackson*, 606 F. App'x at 951–53, when it affirmed a district court's finding that a librarian did not prove overtime wage violations. There, the librarian testified that (1) she worked 7.5 to 10 overtime hours per week without pay from April to September 2009, and (2) she worked 5 to 10 overtime hours per week without pay from September 2009 to February 2010. *Id.* at 948. This was insufficient to prove her overtime claim because she "never stated with any clarity or precision the number of hours she allegedly worked, the amount or nature of that work, where or when the work was completed, or anything else that would assist a factfinder in approximating [her] unpaid overtime." *Id.* at 952; *cf. Kimemiah v. Sun Valley Tech Sols., Inc.*, 2016 WL 7438018, at *11–12 (N.D. Ga. Jan. 8, 2016) (finding an employee met the relaxed burden by relying on documents produced by the employer, time sheets, and travel records from airlines to show that he worked an estimated 229.5 hours of overtime at the client's location, 192 hours of overtime outside the normal 8:00 a.m. to 5:00 p.m. working day, and 293.5 hours of uncompensated travel time); *Malphurs v. Cooling Tower Sys., Inc.*, 2016 WL 915191, at *3 (M.D. Ga. Mar. 4, 2016) (finding an employee met her burden where she identified nine Saturdays on which she cleaned the employer's office or apartment, explained that the employer forced her to continue working during her lunch break after she clocked out, and produced testimony showing the specific

weeks she worked overtime, estimating the number of hours she worked those weeks, and calculating that she was due $1,862.61 based on her time sheets).

This case is on all fours with *Jackson*.  William Mathis estimates that from the summer of 2021 to October 2022, he and his brother worked five or six days per week and 10 to 12 hours per day, but he concedes that they may have worked less depending on the weather or the season. *See* Doc. 43-4 at 3.  He does not identify any of their job sites, the duration of those jobs, or what the jobs entailed.  Mathis' bare and conclusory assertions of his brother's hours are insufficient to support a reasonable inference that he worked uncompensated overtime during the relevant period.  Accordingly, Mathis has not met his burden at summary judgment.[16]

### IV.  CONCLUSION

For these reasons, it is ORDERED that the Motion for Summary Judgment (Doc. 42) is DENIED.

DONE and ORDERED on February 12, 2026.

_____
GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE

---

[16] Mathis also seeks summary judgment on two other issues: (1) that he is entitled to liquidated damages because Stewart cannot show he acted in good faith, and (2) that the statute of limitations for his brother's overtime pay claim should be extended to three years because he has demonstrated that Stewart acted willfully. Doc. 44 at 24–26.  The court cannot afford relief on these issues without finding that Stewart violated the FLSA, which Mathis has not proven at this stage of the proceedings.

22